AILEEN M. MASTIN, RESPONDENT, v. EMERY, BIRD, THAYER DRY GOODS COMPANY, APPELLANT.—140 S. W. (2d) 720.

Kansas City Court of Appeals. April 29, 1940.

*Ryland, Stinson, Mag & Thomson, Wright Conrad* and *Dick H. Woods* for appellant.

*Homer A. Cope, Cope & Hadsell* and *Walter A. Raymond* for respondent.

SHAIN, P. J.—In this action plaintiff seeks damages from defendant for alleged injuries received in defendant's place of business by reason of a fall upon a stairway. The defendant owns and operates a large department store in Kansas City, Missouri.

Plaintiff alleges that her fall and injuries were occasioned and were: ". . . due to the negligence and a carelessness of the defendant, acting by and through its duly authorized agents, servants, and employees, in suffering and permitting a metal strip on the outside edge of the tread of said tenth step to become loose, insecure in its fastenings, and ill-fitting in that it protruded above the surface of the tread of said step, plaintiff was caused to trip and fall, and to be thrown down, upon and against said flight of steps to the mezzanine floor below and hard surfaces thereof, as a direct and proximate result of which plaintiff received severe, permanent and progressive personal injuries."

The defendant joined issue by a general denial and states as follows: "Further answering, defendant states that the carelessness and negligence of plaintiff directly contributed to cause what injury she may have sustained at the time and place in her petition alleged; that plaintiff was careless and negligent in this, to-wit, that she failed to exercise ordinary care to look out for her own safety, and failed to look at and observe the condition of the steps over which she was walking. Plaintiff was careless and negligent in failing to exercise ordinary care for her own safety in the manner in which she walked over said steps, and that her own carelessness and negligence in the manner she walked on said steps directly contributed to cause her injury; that the foregoing carelessness and negligent acts and omissions of plaintiff directly caused and contributed to cause and bring about any injury she may have sustained."

Plaintiff in reply makes general denial of all allegations in defendant's answer.

Trial was by jury and jury verdict was for plaintiff and damages were assessed at $3000. Judgment was had and entered in accordance with verdict and defendant duly appealed.

We will continue to refer to respondent as plaintiff and to appellant as defendant.

At the close of all of the evidence, the defendant asked for a directed verdict in its behalf and same was refused. Defendant's

first assignment charges error in refusal of court to direct a verdict for defendant.

It appears that the plaintiff and her daughter were shopping in defendant's store on November 3, 1938, and after being on the third floor decided to go down to the rest room which was a flight of steps down from the third floor to the mezzanine floor, where the rest room was located.

In passing upon defendant's claim that directed verdict should have been given, we search the record to ascertain as to whether or not there is shown any substantial evidence which justifies submission of issue to a jury.

In the direct examination, the record shows the following questions and answers:

". . . . You were going to walk down a flight of steps, is that correct? A. That is right.

"Q. Did you get to that flight of steps? A. Yes, sir, we did.

"Q. That flight of steps from the third floor to the mezzanine floor extended what direction, as a person would go down to descend the steps, you would be traveling what direction as you would go down the steps? A. South.

"Q. You would go south? A. Yes.

"Q. Do you have any judgment, Mrs. Mastin, as to the width of the flight of steps extending from the third floor to the mezzanine floor and extending in a southerly direction? A. Why no, I haven't. It is a very wide flight of steps.

"Q. Yes, and what side of the steps were you walking on as you traveled down the steps toward the mezzanine floor? A. Well, I was walking on the right side.

"Q. And how far would you say you were walking on the extreme right side of the steps? A. Oh, possibly a foot or a foot and a half.

"Q. Now, where was Eleanor walking with reference to where you were walking? A. Well, she was oh, about a half a step behind me and to my left.

"Q. To your left? A. Yes.

"Q. Were both of you ladies on the west one-half or the right one-half of that flight of steps? A. Yes, we were.

"Q. Yes. As you traveled down the flight of steps did you observe where you were going? A. Yes.

"Q. You looked ahead of you, did you? A. Yes, I did.

"Q. Did you see anything that particularly attracted your attention as you walked down the steps? A. No.

"Q. Did you continue to walk down the steps? A. Yes, I did, part way.

"Q. And how far did you get down before anything unusual or out of the ordinary occurred? A. Why, I got about half-way down the stairs.

"Q. Yes. You may tell the Court and jury in your own language what occurred at that time, Mrs. Mastin. A. Well, I got about half-way down the stairs and I had put my left foot on the step below and as I put my right foot out to take a step I caught my heel and it threw me and I just turned over and over and went down the steps.

"Q. How many steps did you say there is from the point where your heel caught until the surface of the mezzanine floor? A. Well, I would say about ten steps.

"Q. About ten steps? A. Yes, sir.

"Q. Mrs. Mastin, at the time this thing occurred did you have any packages or anything in your arms or under your arms or in your hands? A. Yes, I had my pocketbook and an umbrella.

"Q. Where was your pocketbook being held? In what fashion was it being held? A. Oh, I held it under my arm.

"Q. Where was your umbrella being held? A. In my hand.

"Q. In the same hand? A. Yes.

"Q. As the arm holding the pocketbook? A. They were both in my left hand.

"Q. Mrs. Mastin, when this right heel of your right shoe caught did you have any sensation at that time or realize what had happened? A. Well, I knew that my heel had caught because it gave me a jerk and I could feel a slight click. That is the only way I can explain it. It just hung me there on the step for a moment and then of course the force of my body just pulled it loose and threw me all the rest of the way down the steps.

"Q. What did your heel catch on? A. A piece of metal, the strip.

"Q. A metal strip? A. Yes.

"Q. Where was the metal strip located? A. That metal strip was located at the edge of the step.

"Q. When you say the edge of the step you mean the edge of the tread on which you were attempting to step, or were stepping? A. Yes.

"Q. And do you have any judgment how far, or what was the situation about that metal strip at that time other than what you have told us? A. No, I haven't.

"Q. Did you examine the step afterwards? A. Immediately afterwards?

"Q. Yes. A. No, I didn't."

The plaintiff is shown to have been wearing a shoe with a two and three-eighth inch heel when she fell.

Plaintiff's daughter, who was with her at the time of the accident, was called by plaintiff as a witness, and questions and answers are shown as follows:

"Q. Were you walking side by side of your mother or otherwise as you started down the steps? A. Well, I was just about—well, almost exactly beside her maybe a little bit behind her.

"Q. Yes. Did your mother have anything in her arms or her hands? A. She had a pocketbook and she had an umbrella.

"Q. Do you recall Eleanor, where she was carrying the pocketbook? A. She had it under her left arm, I believe.

"Q. How about her umbrella? A. She had that in her left hand.

"Q. Did you have anything with you as you were going down the stairs? A. Yes. I had my pocketbook and a pair of gloves in my right hand.

"Q. Eleanor, while you and your mother were walking down that particular flight of steps that afternoon, did anything unusual occur so far as your mother was concerned? A. Yes, sir; she fell.

"Q. Now, will you describe in your own language as best you can to His Honor and these twelve gentlemen of the jury just what occurred there and what you saw. A. Well, we started down the steps and I think we got about half way and all of a sudden I just heard a sort of a click like a woman's high heeled shoe makes on a piece of metal. I think anybody that wears high heeled shoes would know it, and I saw mother, just for a second she seemed to be sort of hanging there and then she fell down the steps. She rolled clear over once and fell clear to the bottom of the steps and landed on the floor there at the bottom. She was all sprawled out. She just fell completely.

"Q. Were you in position to see what was hanging your mother there as you have described? A. Well, when I heard the noise I recognized it and just for oh, the tiniest fraction of a second I looked at her and her foot was caught in the metal strip on the edge of the stairway there.

"Q. When you say her foot was caught do you mean the heel or toe? A. Oh, the heel of her shoe.

"Q. What, if anything, did you do, little girl? A. Well, when I saw her fall well, of course, I was scared. It scared me and for a second I stood there and then I started down the steps and I said: 'Oh, mother,' and I went to the bottom of the stairs and I stood right over her and reached down and I said: 'Are you hurt?' and she looked up at me. She didn't say anything, and then three women came over and they helped her up.

"Q. At the time you saw your mother lying sprawled down on the floor, you refer to the mezzanine floor below the third floor? A. Yes, sir.

"Q. And will you describe the appearance of your mother to the Court and jury as she lay sprawled out on the floor, with reference to the look in her face, if there was anything unusual about it. A. Well, when she looked up at me she looked sort of like she didn't realize anything. She was sort of dazed looking; her eyes didn't look like they focused just right.

"Q. What was the color of her face? A. Oh, she was pale.

"Q. Eleanor, did you go with your mother to the rest room immediately thereafter? A. No, not right away.

"Q. What did you do then? A. Well, when I got to the bottom there and after I had asked her if she was hurt and these three women had come over and helped her up, they started to take her to the rest room. I looked back over my shoulder at the stairs and my gloves were lying there so I went back and picked them up.

"Q. When you did so did you make any examination of the metal strip at the edge of the step where your mother's heel was caught? A. Yes, sir, I did.

"Q. I want you to tell the Court and the jury just what you observed about it, as you recall it. A. When I reached over to pick up my gloves I just looked down—they were right there where mother had been. I looked down at the step and the metal tread had been bent up as if it had been, oh, from continual use and being hit against, it had been bent up.

"MR. CONRAD: Just a minute. I object to the words 'from continual use' as stating a conclusion and I will ask that it be stricken out.

"THE COURT: Well, I will strike those words and permit the witness to describe the actual appearance of them, rather than her thought about it."

The witness testified to the actual appearance as follows:

"Q. You do it the way you observed it there without giving your conclusion about it. A. The strip was over the top of the tread of the step like this (indicating) and there was a part of the strip that was up like this (indicating).

"Q. You mean bent in what direction? A. Well, the way people walk down the steps.

"Q. All right. What else did you observe about that metal strip there? A. Well, it was torn and jagged along the top and there were several little torn places or nicks in it. Well, they were darker than the rest of the metal, like they were dirty or—

"Q. (Interrupting): You must not say 'like they were dirty.'

"THE COURT: No, but she can say if it was dirty.

"Q. (By MR. COPE): I will ask you that question. Was this place where it was torn in the metal dirty as compared to the rest of the strip, these torn places and these nicks? A. Yes, sir.

"Q. All right. How far in your judgment would you say this metal strip protruded above the surface of the tread of the step? A. You mean—

"Q. How far above this piece of metal we are talking about here (indicating). A. You mean how far it was sticking up from the step?

"Q. From the surface of the step. Assuming that this handrailing (indicating) is the surface of the step, how far was the metal strip sticking up above from the surface of the step? A. Oh it might have been three inches.

"Q. You don't mean three inches. Do you understand the question? Here (indicating) is the metal tread you have described here? A. Yes.

"Q. How far was it sticking up above the surface of the step on which you stepped down? A. Oh, I see.

"Q. In other words, how far was this little metal strip above this little place? Here, we will get at it this way. How far was this bent place or torn place up above? A. Oh, it was oh, it might have been a quarter of an inch up.

"Q. A quarter of an inch up? A. Yes.

"Q. Eleanor, did you notice whether or not there was any play or whether that metal strip was loose in that vicinity, where you found this particular location? A. When I saw it there I took hold of it and it moved back and forth just a tiny bit. I don't know how much. You could feel it move.

"Q. Did you see anything between the edge of the step there and that metal strip as it stuck up there? A. Yes, sir. It was dirty there.

"Q. What do you mean, dirty? A. Well, like there was dust. I mean as if—there was dust and dirt and stuff like that under it.

"Q. And did you examine the entire step or the entire metal strip? A. No. I picked up my gloves and went back down to the rest room.

"Q. Did you examine how the metal strip was secured to the side of the step or anything like that? A. No, sir.

"Q. Was this a thick metal strip or a thin metal strip? A. Oh, just a thin one. Just a thin metal strip.

"Q. Do you know, the bright color you spoke of, looked like what metal, if you can tell us that? A. Oh, like brass."

The defendant placed in evidence Exhibit 1, claimed to be the step alleged and testified to by plaintiff as the one upon which plaintiff fell. This exhibit showed no such defects as testified to by plaintiff and daughter. Both plaintiff and her daughter were called and testified in rebuttal that the stair step (Exhibit 1) was not the step, and was not in the condition as the one from which plaintiff fell. For purposes of this review, we must accept the testimony of plaintiff, relative to the stair step (Exhibit 1), as true.

As to whether or not the testimony of the daughter, Eleanor Jean Mastin, presents an issue of fact as to whether or not the defendant knew, or by the exercise of due care could have known, of the defective condition of the nosing of the tenth step prior to the time plaintiff fell, presents the vital question from which must be determined the issue of directed verdict presented in defendant's point one.

Appellate courts, especially if intermediate, are confronted with difficulties in determining the issue, *supra,* unless there appears in evidence a fixed period of time that a defect has existed.

In McKeighan v. Kline's, Inc., 98 S. W. (2d) 555, the Supreme Court of Missouri held that a grease spot in a vestibule, on which

a party slipped and was injured, did not meet notice required, for reason that same may have. been deposited. there by someone immediately preceding the one injured.

In State ex rel. Trading Post v. Shain, 116 S. W. (2d) 99, it is held that the fact that there were dark and bruised vegetable stalk and leaves on floor, causing one to fall, was not sufficient to impart notice, notwithstanding that such unsellable leaves had been taken off before the product was placed in the store for sale.

In Stewart v. George B. Peck Company, 135 S. W. (2d) 405, the fact that a plate upon a stair step was loose, moving up and down when stepped upon, causing a screw (when plate was stepped upon) to protrude above the top of the plate three thirty-seconds of an inch, and that screw could be moved up and down and showed a little cone of dirt under it, was held by this court to present evidence that raised an issue of fact as to impart notice. In the aforesaid case, the Supreme Court denied writ for *certiorari*.

It has been held, when a man slipped and fell from slipping on a loose nail on a railroad platform, that issue of notice was raised from fact that other loose nails were on the platform.

It has been held that the fact one slipped and fell from slipping on a dark colored banana skin, that issue of notice was not raised because of the fact that wholesome bananas often had dark skins.

The borderline of liability in respect to situations that present issue of notice present difficulties. The Supreme Court of Missouri has declared that the issue of notice is raised if the case is one where different minds might reasonably draw different conclusion. [Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S. W. (2d) 58.]

The evidence, to the effect that a portion of the metal strip on the step was torn and jagged along the top, and there being dirt under the torn metal strip, and metal strip where torn looked dirty, we conclude makes an issue of fact for the jury. We, therefore, hold that refusal of directed verdict was not error.

Defendant claims error in court's refusal to give its instruction C. The instruction told the jury that there was no evidence of notice, and allowed verdict for defendant on that theory. What we have said as to peremptory instruction, *supra*, applies. We find no error.

Defendant's third assignment is as follows:

"The Court erred in giving plaintiff's instruction '1' for the reason that it assumed plaintiff was exercising ordinary care for her own safety at the time she tripped."

The instruction complained of has the following language:

". . . if you find defendant did so fall; and if you further find that while plaintiff was descending said flight of steps, in the exercise of ordinary care for her own safety, she tripped on said metal strip of said step, if so, and was thereby caused to fall down the remaining steps in said flight of steps, if so; and that plaintiff was caused to

trip and fall and be injured, if so, as the direct and proximate result of the negligence of the defendant, as submitted in this instruction, if you so find, then your verdict should be for the plaintiff and against the defendant."

The court gave a further instruction as follows:

"You are further instructed that the Court does not mean to assume as true or established any of the matters mentioned or referred to in the instructions, but leaves you to determine from the evidence whether or not such matters have been established as facts by the evidence."

We conclude against defendant on its point three.

Defendant's fourth and last point is that the verdict was excessive. Plaintiff secured verdict and judgment for $3000. There is evidence that plaintiff had a very serious sickness some three or four years before the accident herein involved, but that she had entirely recovered therefrom. There is evidence that as a result of the accident both ankles and left leg were injured and she was caused to suffer pain in back, neck, shoulders and head. Further, that she was made nervous and ached all over.

Dr. William M. Korth, who had treated plaintiff, testified in her behalf. As to plaintiff's condition at the time of the trial, the doctor testified as follows:

"You may tell the court and the jury what, if anything, your examination disclosed on March 1, 1939. A. Mrs. Mastin's symptoms and findings now are mostly located in the lower back around the sacrum. That is the wide bone in the lower back. Motions forward are limited and in attempting to raise from the forward bending position it is definite pain and she had difficulty in doing it. She is unable to lift any heavy object for that reason. There is definite weakness in the lower back. She complains also of headaches. She has pain along the neck in the same region she originally had it. That is, on the left side.

"Q. Do I understand that that is the conclusion of your answer, Doctor? A. Yes.

"Q. Doctor, considering the fact that these injuries occurred on the third day of November, 1938, and were present in the condition you found them on March 11, 1939, tell the court and the jury in your opinion as a physician and surgeon whether or not these injuries, particularly to the lower back, are permanent. A. I would say they are. She has a permanent weakness."

As to protection for her back, the following questions and answers appear:

"Q. Have you reached any conclusion as to any mechanical support she ought to have at this time? A. Well, she was strapped with adhesive tape to mobilize her lower back. That was done two or three times. I don't have the record of how many times. I have the record

of twice, and it did relieve her at the time; and, no brace was ordered at that particular time because she had a girdle which most women wear which seemed to support her fairly well, but I believe at this time a stronger brace with wire stays in the back should be made and that she should wear it.''

The question of verdict being excessive was presented to the trial court in defendant's motion for a new trial. The trial court passed upon this question adversely to defendant, and from an examination of the record we see no reason for convicting the trial court of error on its determination of the question of excessive verdict. Judgment affirmed. All concur.